

**SO ORDERED.**

**SIGNED this 10th day of July, 2007.**

_Dale L. Somers_
**Dale L. Somers**
**UNITED STATES BANKRUPTCY JUDGE**

tdu_____

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| In Re: | |
| **BARRY L. BROWN and** **VALERIE J. BROWN,** | **CASE NO. 06-10005** **CHAPTER 7** |
| **DEBTORS.** | |
| **VIA CHRISTI REGIONAL MEDICAL CENTER, INC. ,** | |
| **PLAINTIFF,** | |
| **v.** | **ADV. NO. 06-5182** |
| **BARRY L. BROWN and** **VALERIE J. BROWN,** | |
| **DEFENDANTS.** | |

**MEMORANDUM AND ORDER FOLLOWING TRIAL DENYING PLAINTIFF'S MOTION FOR RELIEF FROM STAY AND COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT**

On May 1 and 2, 2007, trial was held on the Motion for Lift of Automatic Stay[1] and Complaint to Determine Dischargeability of Debt[2] filed by Creditor Via Christi Regional Medical Center, Inc. (hereafter "Medical Center" or "Creditor"). Medical Center appeared by Mary Patricia Hesse, of Redmond & Nazar, LLP. The defendants, Debtors Barry L. Brown and Valerie J. Brown (hereafter "Debtors"), appeared by M. Steven Wagel of the Law Offices of M. Steven Wagel, P.A. There were no other appearances. Because both the complaint and the motion for relief from stay arise out of the same facts, the motion has been tracked with the adversary proceeding. The Court has jurisdiction.[3]

**PROCEDURAL POSTURE AND ISSUES PRESENTED.**

This case concerns Debtors' liability for Medical Center's claim of $56,629.12 for charges incurred for the treatment of Debtor Valerie Brown following an automobile accident. Although Debtors received proceeds from the settlement of a personal injury claim against the driver at fault, they used those funds for living expenses and the purchase of two vehicles, rather than payment of the Medical Center's charges.

---

[1] Case no. 06-10005, Doc. 16.

[2] Case no. 06-10005; Adv. no. 06-5182, Doc. 1.

[3] This Court has jurisdiction pursuant to 28 U.S.C.§ 157(a) and §§ 1334(a) and (b) and the Standing Order of the United States District Court for the District of Kansas that exercised authority conferred by § 157(a) to refer to the District's Bankruptcy Judges all matters under the Bankruptcy Code and all proceedings arising under the Code or arising in or related to a case under the Code, effective July 10, 1984. A motion for relief from stay and a complaint to determine discharge are core proceedings which this Court may hear and determine as provided in 28 U.S.C. § 157(b)(2)(G)and (J). There is no objection to venue or jurisdiction over the parties.

On February 9, 2006, the Medical Center filed the motion for relief from stay to obtain possession of the two vehicles. Debtors objected. On March 31, 2006, the Medical Center filed an objection to the dischargeability of its claim pursuant to 11 U.S.C. § 523(a)(6). Debtors contend their liability to Medical Center is dischargeable.

On August 11, 2006, Medical Center filed a motion for partial summary judgment on the relief from stay motion. Creditor's motion requested the Court to lift the automatic stay so that Creditor could return to state court for the purpose of establishing a constructive trust in two vehicles owned by the Debtors and claimed as exempt. Creditor requested stay relief extend to obtaining possession of those vehicles for sale and application of the proceeds on the claim of Creditor. The Court denied the motion by Memorandum and Order Denying Plaintiff's Motion for Relief from Stay, filed on October 31, 2006. When denying the motion, the Court ruled that Medical Center could not return to state court for the purpose of establishing a right to sell the two vehicles purchased with settlement proceeds and that the validity of the Medical Center's lien and its claim to a constructive trust were better litigated in this Court. In addition to being a motion for relief from stay, the Court construed the motion to be an objection to Debtors' exemption of the two vehicles[4] and retained jurisdiction of the motion to address that issue. Of

---

[4] Medical Center's basis for stay relief is that the Debtors on the date of filing held only bare legal title to the vehicles, which they had in their possession as constructive trustees of the Medical Center. This is in essence an objection to Debtors' exemption of the two vehicles without recognition of the Medical Center's asserted interest in the same property. Exemptions are allowed unless there is a timely objection. *Taylor v. Freeland & Kronz*, 503 U.S. 638 (1992). Fed. R. Bankr. P. 4003(b) requires that objections to exemptions be filed within 30 days after conclusion of the meeting of creditors but prescribes no specific form. Various actions by creditors have been deemed to be objections to exemptions even though there was no pleading styled "objection to exemption." *Spenler v. Siegel (In re Spenler)*, 212 B.R. 625, 630 (9th Cir. BAP 1997). In *Havas Leasing Co. v. Breen (In re Breen)*, 123 B.R. 357 (9th Cir. BAP 1991) a secured creditor's motion for relief from stay filed within 30 days after the conclusion of the meeting of creditors was held to constitute a timely objection to exemption because of the nature of the allegations. In this case, the Motion for Relief from Stay was filed on February 9, 2006,

3

course, if the Medical Center is found to be entitled to the equity in the vehicles, relief from stay to realize that interest would be appropriate, notwithstanding the Court's prior denial of stay relief based upon enforcement of the state court judgment.

Accordingly, the issues before the Court at trial were: (1) Whether the Medical Center had a lien in the personal injury settlement proceeds when received by Debtors; (2) whether Medical Center has an interest in the two vehicles by way of lien, constructive trust, or special equity; and (3) whether the Medical Center's claim is excepted from discharge by § 523(a)(6).

**FINDINGS OF FACT.**

Debtor, Valerie J. Brown, was seriously injured in a head on automobile collision on September 15, 2004. She was transferred to the Medical Center and received services at that facility from September 15, 2004 through September 24, 2004. Her automobile was insured by State Farm. The charges for the admission were in the amount of $81,351.02. The driver of the vehicle that collided with Valerie Brown's vehicle was Jesus R. Salinas, and his liability insurer was Farm Bureau Insurance Company.

Upon Valerie's admission, Debtor Barry Brown signed an Admission Consent agreement.[5] It provided in part:

> 4. DIRECTION TO PAY MEDICAL INSURANCE BENEFITS
> DIRECTLY TO MEDICAL CENTER AND ASSIGNMENT OF
> INSURANCE BENEFITS . . . I understand and agree that I am

---

less than 30 days after the conclusion of the meeting of creditors on January 30, 2006, and makes allegations which are inconsistent with the claim of exemption of the two vehicles.

[5] The document also reflects a signature by Valerie Brown, but the evidence established that she did not sign the form. Her husband did not recall whether he signed on his wife's behalf. Throughout this opinion, the Court makes no distinction between the actions, testimony, liability, and dischargeabilty of the Medical Center's claim as to Barry Brown and Valerie Brown because the resolution of the issues makes any such distinctions irrelevant.

4

responsible for any remaining balance not covered by insurance. I promise to pay Via Christi any medical insurance benefits I receive which relate to or arise from hospital care which is the subject of this admission. I hereby assign to Via Christi any and all medical benefits payable from any policy of insurance insuring the patient or person responsible for the patient's care (including, but not limited to, Medicare, Medicaid, Blue Cross & Blue Shield and others) to be paid directly to Via Christi to be applied to the charges for services rendered.

\* \* \*

8. PROMISE TO PAY FOR SERVICES AND GRANT OF SECURITY INTEREST IN HEALTHCARE INSURANCE RECEIVABLES: In consideration of the admission, care and treatment provided to the patient, the undersigned, whether signing as patient or responsible person, agrees to pay Via Christi on demand all charges for services rendered in accordance with its regular rates on this date . . .. To secure payment of the amount due Via Christi for care and treatment provided to the patient, the undersigned, whether signing as patient or responsible person, hereby grants to Via Christi a security interest in all healthcare insurance receivables.

Valerie Brown, age 49, was employed as a receptionist at the time of the accident but has not been able to work since the accident because of the injuries she sustained. Barry Brown, age 52, lost his job after the accident, and was unemployed, or worked only limited hours, for a period of time. At the time of trial, he was employed.

On October 29, 2004, Medical Center filed a Statement and Notice of Hospital Lien with the Clerk of the Sedgwick District Court. It asserted a lien pursuant to K.S.A. 65-406, et seq. for treatment by reason of an accident on September 15, 2004 in the amount of $84,451.02. The notice states a copy was sent by registered or certified mail to the persons named on the form. The form names the patient as Valerie Brown, and the alleged liable party's insurance carrier is

5

stated to be State Farm.[6]  The lines for the name and address of the alleged liable party and the injured person's attorney are blank.  The Browns received a copy of the lien statement.

In January or February, 2005, the Browns retained an attorney to pursue a recovery for damages suffered in the accident.  The collection notes generated by Medical Center include an entry dated February 26, 2005 stating that the Browns hoped they would receive health insurance benefits of $45,000 and that they had a liability claim pending.  The name of their attorney was entered on the notes on March 2, 2005.

On March 7, 2005, Medical Center filed an amended Statement and Notice of Hospital Lien.  It added only the name and address of the Injured Person's Attorney.  Debtors and their attorney received a copy of the amended notice.  However, Medical Center made no attempt to learn the identity of Mr. Salinas or his insurance carrier, even though this information was on the accident report which is a public record.

In late March 2005, the Browns made application to Medical Center for financial assistance.  It was the Browns' understanding that through this procedure a portion of the bill could be written off and terms for payment of the remainder could be arranged.  Such requests are handled for the Medical Center by the Midland Group.  The application included financial information about the Browns. In March and May, Midland sent correspondence requesting supporting information.  Debtors responded to and tried to comply with the requests.  Some of the information provided by the Browns was inaccurate and incomplete.  For example, the Browns listed only one of two bank accounts.  The incomplete information apparently delayed

------

[6] As stated above, State Farm insured Valerie Brown.  Farm Bureau insured Jesus Salinas.

6

the formulation of a payment plan, but there is no evidence that it caused Midland to make an inappropriate settlement proposal.

Browns' personal injury attorney proceeded to negotiate a settlement with the insurance carrier for Mr. Salinas. There was no assertion that Mr. Salinas' negligence did not cause the accident, and settlement for the policy limit of $100,000 was offered. The Browns' attorney, who had been served with the amended lien statement, advised the Browns that in his opinion based upon his research of the Kansas hospital lien statutes and case law, neither the original nor the amended lien statement was enforceable. However, he had a conflict of interest that prevented him from negotiating a settlement with Medical Center on their claim for hospital charges. Therefore, Debtors' personal injury counsel referred them to another attorney for consultation regarding the proposed settlement for the policy limit, their finances, and the claim of Medical Center. Debtors first met with this counsel, a recognized member of the bankruptcy bar, on April 26, 2005. There was no testimony regarding the subjects explored or the advice given. After this consultation, the settlement of the liability claim for $100,000 was finalized.

On June 20, 2005, a settlement check in the amount of $74,162.32 made payable to Valerie Brown, and drawn on the personal injury attorney's trust account, was issued and delivered to the Browns. A release of all claims drafted by Farm Bureau was forwarded to the Browns by their counsel by letter dated June 20, 2005. That letter discussed the Medical Center's lien statements. Their counsel advised the Browns that in his opinion Medical Center had not complied with the requirements of the lien statute to make the hospital lien valid because it had not served the lien on Farm Bureau or Mr. Salinas, nor noted these names on the statement. The Browns were also advised that they should expect the Medical Center to pursue

7

enforcement of the lien and collection of the charges. The Browns had no specialized legal knowledge and relied upon the advice of counsel.

Debtors did not intend the Medical Center to get all of the settlement and did not pay the Medical Center's charges from the settlement amount. Debtors planned to make arrangements for payment of the outstanding bill through the Medical Assistance Program. The settlement funds were deposited into a bank account having a balance before the deposit of $200.00. On June 23, 2005, $25,272.04 of the settlement proceeds was used to purchase a 2005 Chevy Silverado truck, and on September 8, 2005, $22,477.02 of the settlement proceeds was used to buy a 2006 Honda Accord. Miscellaneous living expenses and charges relating to the vehicles, such as insurance, taxes, and tags, were also paid from the account. As of January 18, 2006, the account balance was $124.48.

On August 15, 2005, Barry Brown called Midland to check on the status of the Financial Assistance Application. Before this call, Midland received some of the additional information it requested. During this phone call, Midland learned that the personal injury suit had been settled, the settlement funds had been received by the Browns, and the Browns were using the funds for living expenses. Processing of the Financial Assistance Application was halted because of Medical Center policy that does not allow processing when lien issues are unresolved. Midland advised the Medical Center legal department of the situation.

The Browns again met with their financial affairs counsel on September 12, 2005. During this conference with counsel, the Browns explored the possibility of settlement with Medical Center. Browns informed counsel that they had purchased two vehicles with the settlement proceeds, and the Medical Center's assertion of a lien was probably discussed. It is

8

likely that counsel for Medical Center was called regarding settlement while the Browns were in their attorney's office. This led to an exchange of letters and also phone calls between the Medical Center's lawyer and the Browns' personal injury and financial affairs counsel. On September 15, 2005, counsel for the Medical Center sent a letter to the Browns' personal injury lawyer with a copy to financial affairs lawyer stating that a lawsuit was being prepared. Informal settlement discussions occurred regarding the Browns' failure to turn over the settlement funds, but there were no formal offers. Barry Brown rejected the proposed settlement as not fair. The Browns wished to pay the Medical Center through a series of regular payments, rather than in a lump sum as proposed.

On November 3, 2005, the Medical Center filed a petition under chapter 60 against the Debtors in the District Court of Sedgwick County, Kansas, Case No. 05 CV 4141.[7] The petition alleged the delivery of services, the charges, and nonpayment. Plaintiff further alleged that it had a lien on settlement proceeds in the hands of Valerie Brown, and, to the extent that settlement proceeds were used to purchase identifiable property and/or are traceable, the plaintiff claimed a continuing lien in the proceeds of the settlement. The relief sought was judgment against the Debtors in the amount of $81,351.02, plus interest and costs. Further, the Medical Center prayed for an order that any funds remaining in the Brown's hands be held in escrow.

Barry Brown called the Medical Center's counsel after being served. During that conversation, the attorney for the Medical Center confirmed that Debtors were unemployed. The

---

[7] The Browns testified that the Medical Center's knowledge that Debtors were consulting with their financial affairs attorney, a recognized member of the Wichita bankruptcy bar, was the impetus for the later filing of the law suit against the Browns in state court.

9

attorney also confirmed that most of the funds had been used for the purchase of two vehicles, and the approximately $8,000 of the settlement money that remained was being used for living expenses. By letter dated November 30, 2005, and addressed to the Browns' financial affairs counsel, Medical Center asked for detailed information regarding the vehicles and proposed that the claim be settled by the Browns turning over $4,000, granting the Medical Center liens on the two vehicles, and then working out a payment schedule. Counsel forwarded the settlement proposal letter to the Browns, but no response, either by phone or letter, was received. Barry Brown testified he did not respond because the law suit had been filed.

Debtors consulted with a new attorney regarding the law suit, but Debtors did not respond to the petition, and a default judgment was entered on December 2, 2005. It granted judgment against the Debtors in favor of the Medical Center in the amount of $81,351.02, plus other charges and a constructive trust in property which the court determines was purchased with the settlement proceeds. In its October 31, 2006 order, this Court, held the constructive trust aspect of this judgment not binding upon the Debtors.

The attorney Debtors consulted regarding the state court litigation referred Debtors to bankruptcy counsel. On December 11, 2005, Browns advised the financial affairs attorney, whom they had consulted at the request of their personal injury lawyer, that they no longer needed his services. Debtors retained the recently referred bankruptcy counsel and, with his assistance, filed for relief under Chapter 7 on January 4, 2006, about a month after the entry of the default judgment. Their Schedule C claimed two vehicles as exempt, a 2005 Chevy Silverado and a 2006 Honda Accord.

10

Review of Debtors' bank statements established that there were some transactions which should have been included in their statement of affairs or schedules but were omitted. These include: (1) Receipt on or about December 22, 2005, less than two weeks pre-petition, of $6,502. from State Farm, probably for Valerie Brown's lost wages; (2) the receipt of the settlement proceeds in June 2005; (3) payments to Capitol Federal on their home loan within 90 days pre-petition; and (4) gifts to their church. The statement of affairs disclosed only one of two bank accounts. Debtors' credible testimony was that they did not know these matters should have been included or they misunderstood the questions. There was no evidence of a motive to evade disclosure or hide assets or transactions. Discrepancies between the financial information in the Medical Assistance Application and the bankruptcy pleadings were established, but again there was no evidence of wrongful intent by the Debtors.

After the bankruptcy was filed, the Medical Center received $24,721.90 from Debtors' personal injury attorney for application to the Medical Center's claim against the Browns. There was no testimony as to the source of those funds. This leaves a balance of $56,629.12 on the Medical Center's bill.

**ANALYSIS.**

**A. Medical Center had a lien on the personal injury claim settlement proceeds when received by Debtors**.

Creditor's claim to the vehicles is based upon a contention of a lien arising from the fact that the vehicles were purchased with proceeds from the personal injury settlement. Two alternative lien theories are presented. The first relies upon the Admission Consent Agreement and Article 9 of the Kansas Uniform Commercial Code. The second asserts that the Medical Center's lien statement is enforceable against the Browns.

11

**1. The Medical Center was not granted a lien in the settlement proceeds by the Admission Consent Agreement.**

As quoted above, when Barry Brown signed the Admission Consent Agreement, he granted the Medical Center a "security interest in all healthcare insurance receivables."[8] The controlling issue is whether the Debtors' right to the settlement funds were "health-care-insurance-receivables" as defined by Article 9.

K.S.A. 84-9-102(46) provides: "'Health-care-insurance-receivable' means an interest in or claim under a policy of insurance which is a right to payment of a monetary obligation for health-care goods or services provided." Medical Center provides no case authorities construing this definition, and the Court's own research located none. A well respected commentator states that health care receivables are a subcategory of accounts receivable.[9] The Court concludes that health care receivables are amounts owed for health care services, such as from Blue Cross, Medicare, or other health care insurance.

In this case, the Browns received the settlement proceeds under Jesus Salina's general liability policy.[10] The funds were not proceeds of a right to payment for health-care goods and services; they were in payment of the damages caused by the negligence of Jesus Salinas. The Medical Center did not have a lien in the settlement proceeds based upon the granting of a security interest in health care receivables in the Admission Consent Form.

---

[8] Because the Court finds the settlement proceeds are not a "health care receivable," the Court does not consider whether the lien would be enforceable against Valerie Brown's interest in the proceeds even though she did not sign the Admission Consent Agreement.

[9] 2 Barkley Clark, *The Law of Secured Transactions Under the Uniform Commercial Code*, ¶ 10.07 (Rev. Ed. 1993 and Supp. 1999).

[10] The issue of whether automobile insurance specifically providing coverage for medical expenses is not before the Court.

12

**2. The Medical Center's lien statement was enforceable against Valerie Brown.**

The second basis for a lien asserted by the Medical Center is pursuant to the hospital lien

statutes, K.S.A. 65-406, *et seq*. The relevant portions of the statutes provide:

> **65-406. Liens upon personal injury damages recovered by patient; exception; enforcement of claimed lien in excess of $5,000.**
> (a) Every hospital, which furnishes emergency, medical or other service to any patient injured by reason of an accident not covered by the workers compensation act, if such injured party asserts or maintains a claim against another for damages on account of such injuries, shall have a lien upon that part going or belonging to such patient of any recovery or sum had or collected or to be collected by such patient . . ., whether by judgment or by settlement or compromise.
> (b) Such lien shall be to the amount of the reasonable and necessary charges of such hospital for the treatment, care and maintenance of such patient in such hospital up to the date of payment of such damages. . ..
> (c) In the event the claimed lien is for the sum of $5000 or less it shall be fully enforceable as contemplated by subsection (a) of this section.  In the event the claimed lien is for a sum in excess of $5,000 the first $5,000 of the claimed lien shall be fully enforceable as contemplated by subsection (a) of this section, and that part of the claimed lien in excess of $5,000 shall only be enforceable to the extent that its enforcement constitutes an equitable distribution of any settlement or judgment under the circumstances.  In the event the patient . . . and the hospital or hospitals cannot stipulate to an equitable distribution of a proposed or actual settlement or a judgment, the matter shall be submitted to the court in which the claim is pending, or if no action is pending then to any court having jurisdiction and venue of the injury or death claim, for determination of an equitable distribution of the proposed or actual settlement or judgment under the circumstances.
>
> **65-407. Same; notices and itemized statement of claims; requirements.**
> No such lien shall be effective unless a written notice containing an itemized statement of all claims, the name and address of the injured person, the date of the accident, the name and location of the hospital, and the name of the person . . . alleged to be liable to

13

the injured party for the injuries received, shall be filed in the office of the clerk of the district court . . . prior to the payment of any moneys to such injured person . . . as compensation for such injuries; nor unless the hospital shall also send, by registered or certified mail, postage prepaid, a copy of such notice with a statement of the date of filing thereof to the person or persons, . . . alleged to be liable to the injured party for the injuries sustained prior to the payment of any moneys to such injured person . . . as compensation for such injuries.  Such hospital shall mail a copy of such notice to any insurance carrier which has insured such person, firm or corporation against such liability, if the name and address shall be known.  Such hospital shall also send, by registered or certified mail a copy of such notice to such patient upon whom emergency medical or other services has been performed, if the name and address of such patient shall be known to the hospital or can with reasonable diligence be ascertained.

**65-408. Same; persons liable to hospital; limitation of actions.**
Any person or persons . . . making any payment to such patient or to his attorneys . . . for the injury sustained, after the filing and mailing of such notice without paying to such hospital the amount of its lien . . . shall, for the period of one year from the date of payments to such patient . . . be and remain liable to such hospital for the amount which such hospital was entitled to receive . . ..

In this case, the Medical Center filed a lien statement on October 29, 2004 and an amended lien statement on March 7, 2005.  The first lien statement does not include the names and addresses of the injured party's attorney, the person alleged to be liable to the injured party, or the insurance carrier of the person alleged to be liable.[11]  Although the amended statement includes the name and address of the injured party's attorney, it does not include the other missing information specified by K.S.A. 65-407.  The question is whether these omissions, coupled with the Medical Center's failure to serve the lien on these persons, renders the lien invalid as between the Medical Center and the Debtors.

---

[11] Both the original and amended lien statements listed State Farm as the alleged liable party's insurance company.  This insurer provided coverage to Valerie Brown, not Jesus Salinas.

14

Although Kansas has had a hospital lien statue since 1939, the only two reported appellate cases address priority disputes where there was no question as to the validity of the lien. The Kansas Supreme Court has construed a hospital's lien in personal injury settlement proceeds under K.S.A. 65-406 to be inferior to a competing lien of an insurance carrier that had paid personal injury protection benefits to the injured party because the PIP lien statute was the more recent legislative pronouncement.[12] The Kansas Court of Appeals has held that where the settlement proceeds are sufficient to fully satisfy the amount of the hospital lien and the injured party's attorney fees, the hospital's lien is not subject to deduction for payment of the fees.[13] Neither of these cases is helpful here.

This Court is thus presented with interpreting the Kansas statues. When doing so, it must interpret the state law according to the state rules of statutory construction.[14] In Kansas, the fundamental rule of statutory construction, to which all other rules are subordinate, is that the intent of the legislature governs, if it can be ascertained.[15] To determine intent, the courts are not limited to the words used, but may consider the purpose to be accomplished and the effect the statute might have under the suggested constructions.[16] It is commonly stated that statutory liens are strictly construed.[17] This means "a statutory lien cannot be extended by the courts to cases

---

[12] *Richards v. Etzen*, 231 Kan. 704, 705, 647 P.2d 1331, 1332 (1982).

[13] *Harlow v. Lloyd*, 15 Kan. App.2d 497, 499, 503, 809 P.2d 1228, 1230, 1233 (1991).

[14] *Phelps v. Hamilton*, 59 F.3d 1058, 1071 (10th Cir. 1995); *In re Hodes*, 308 B.R. 61, 68 (10th Cir. BAP 2004).

[15] *Farmers Ins. Co. v. Southwestern Bell Tel. Co.*, 279 Kan. 976, 978, 113 P.3d 258, 260 (2005).

[16] *Jones v. Kan. State Univ.*, 279 Kan. 128, 145, 106 P.3d 10, 22 (2005).

[17] *E.g., Mark Twain Kansas City Bank v. Kroh Bros. Dev. Co.*, 14 Kan. App.2d 714, 718, 798 P.2d 511, 515 (1990) *rev. denied* Dec. 19, 1990 (mechanics lien); *Jefferson County Coop. Ass'n v. Ne.*

15

not provided for."[18]  This rule applies to whether the lien has attached, indemnification of the fund to which the lien attaches, and whether the persons claiming the lien benefit come within its terms.[19]  When construing Kansas statutes, the state appellate courts find authorities from other states interpreting similar statutes are helpful.[20]

The statutory construction issue presented is whether the Medical Center's lien attached to the Salinas settlement proceeds in the hands of the Debtors, notwithstanding the failure of the lien statements to name and failure to serve all of the parties identified in K.S.A. 65-407.  It is agreed that the conditions for a lien as stated in K.S.A. 65-406(a) are satisfied.  The focus is on the apparent conflict between the phrase "shall have a lien" in K.S.A. 65-406(a) and the statement in K.S.A. 65-407 that "[n]o such lien shall be effective unless" the persons enumerated are provided notice and service made.  The Medical Center contends that K.S.A. 56-406(a) determines attachment, that K.S.A. 56-407 governs effectiveness (perfection and enforceability) of the lien against persons other than the injured party, and because it seeks to enforce the lien only against the injured party, the failure to comply with all aspects of K.S.A. 65-407 is immaterial.  The Debtors, on the other hand, contend that compliance with K.S.A. 65-407 is necessary for the lien to be "effective" for any purpose, and since the conditions of K.S.A.65-407 were not satisfied, the lien is not effective against the Debtors, as well as other parties.

---

*Kan. Prod. Credit Ass'n*, 73 B.R. 3, 5 (D. Kan. 1982) (warehousemen's lien).

[18] 51 Am. Jur.2d *Liens* § 54 (2007).

[19] *Id.*

[20] *E.g., Chapman v. Parker*, 203 Kan. 440, 445, 454 P.2d 506, 510 (1969).

16

This Court finds the Medical Center's position correct. The purpose of the hospital lien statute is to ensure payment to hospitals out of any recovery by patients for medical care provided to patients injured as a result of an accident.[21] Clearly, the Medical Center is within the class to be benefitted by the legislation. If Debtors' construction were adopted, it would erode the effectiveness of the legislation by requiring hospitals to satisfy all prerequisites for enforcement of the lien against all parties before the lien attaches to proceeds of settlements or judgments in the hands of the patient.

Hospital lien statutes of other states have been construed in the manner urged by the Medical Center. An Iowa case[22] is the most instructive because it construed a hospital lien statute[23] substantially identical to the Kansas version. The first section of the Iowa statutory scheme, section 582.1, like Kansas K.S.A. 65-406, provided that a hospital "shall have a lien" upon the part of a claim for damages recovered by the injured party. The second section, section 582.2, like K.S.A. 56-407, provided that "no such lien shall be effective" unless the lien statement is filed containing specific information and that statement is mailed to specified parties. A third provision, section 582.3, like K.S.A. 65-408, provided for enforcement. In the Iowa case, the injured party contented that the hospital's failure to notify his underinsured motorist carrier in accord with the Iowa equivalent of K S.A. 56-407 defeated the lien in the benefits paid to him by that insurer. The Iowa Supreme Court rejected this construction. It stated:

---

[21] *Harlow v. Lloyd*, 15 Kan. App.2d at 499, 809 P.2d at 1230.

[22] *Baker v. Iowa Methodist Med. Ctr.*, 542 N.W.2d 847 (Iowa 1996).

[23] Iowa Code § 582.1, et. seq. (1993).

> . . . We are convinced that the purpose of the notice requirements
> in section 582.2 is to advise damage payers as to the potential
> liability under section 582.3 should they not act to protect the
> hospital's lien rights.  These notice provisions are not for the
> benefit of the injured patient who is not required to be notified
> pursuant to section 582.2.[24]  As to the injured patient, the lien is
> imposed by operation of section 582.1 . . ..[25]

State hospital lien statutes from other states in addition to Iowa are also construed to create an

enforceable lien against the patient even when the procedural requirements for enforcement have

not been fully satisfied.[26]

Cases from other jurisdictions hold that failure to comply with the statutory filing and

notice requirements provisions is fatal to the existence of a lien, but do so based upon statutes

materially different from the Kansas lien law.  In one case, the controlling statute expressly

stated the lien would be void if the hospital failed to give notice to the person injured and the

---

[24] In contrast to the Iowa statute, K.S.A. 65-407 does require the hospital to notify the patient of the lien, but such notice is not for purposes of liability under K.S.A. 65-408, as the patient is not among those whose liability is addressed in that section.

[25] *Baker v. Iowa Methodist Med. Ctr.*, 542 N.W.2d at 849.

[26] *E.g., W. Neb. Gen. Hosp. v. Farmers Ins. Exch.*, 239 Neb. 281, 475 N.W.2d 901 (1991) (holding lien is enforceable against the patient upon attachment pursuant to statute stating that hospital shall have a lien upon providing care, regardless of whether hospital has complied with the statutory notice provisions); *Guin v. Carraway Methodist Med. Ctr.*, 583 So. 2d 1317 (Ala. 1991) (holding that hospital has automatic lien for value of services and failure to timely file a lien statement, although resulting in the lien being unperfected, does not affect the lien as between the hospital and the injured patient); *Stephens v. Parkview Hosp., Inc.*, 745 N.E.2d 262 (Ind. Ct. App. 2001) (holding where there was no showing of prejudice from failure to serve notice of lien, actual knowledge of the hospital's lien by the patient's attorney was sufficient for purposes of the hospital lien act, even though hospital admitted it did not perfect its lien in accordance with the provisions of the act); *Medcenter One, Inc. v. Dueis (In re Dueis)*, 130 B.R. 83 (Bankr. D. N.D. 1991) (under North Dakota law, which provides that "lien attaches to all claims," lien attaches and is enforceable against the patient when services are rendered, and it is by either actual or constructive notice that lien is perfected so that statutory notice provisions are not prerequisites for enforcement); and *St. Mary's Med. Ctr. v. Nelson (In re Nelson)*, 92 B.R. 837 (Bankr. D. Minn. 1988) (holding under Minnesota law, lien attaches to plaintiff's cause of action when services are rendered and lien was therefore enforceable against the patient notwithstanding any failure of perfection).

18

person allegedly liable.[27]  In another, the court found no lien on settlement proceeds being held

by the court when the lien statement was not timely filed.[28]  The controlling statute provided:

"No lien  . . . shall be valid with respect to any claims whatsoever unless the person . . . entitled

to the lien  . . . shall file a claim with the clerk of the court . . . within 30 days after the institution

of such action . . .."[29]  The Kansas hospital lien statute has no similar provision which voids the

lien for non-compliance with filing or notice provisions.

This Court finds that the Kansas Supreme Court, if faced with the issue, would hold

under the circumstances of this case that failure of the lien statements to include the allegedly

liable party's name and address and his insurance carrier's name and address did not render the

lien ineffective as against the injured patient.  The Court finds the notice, filing, and service

requirements of K.S.A. 65-407 are related to the enforcement of liability against persons making

payment to the injured patient or his attorney pursuant to K.S.A. 65-408.  That enforcement

statute expressly refers to filing and mailing of the lien statement.  Here, the Medical Center

seeks to enforce the lien under K.S.A. 65-406, which makes no reference to the lien statement,

its content, or the duty to mail the statement to enumerated persons.  It provides for creation of

the lien (the hospital "shall have a lien") and the amount of the lien.  This Court agrees with the

Iowa Supreme Court's construction of nearly identical statutes.  The lien is imposed upon the

injured person by operation of law as provided in K.S.A. 65-406, and compliance with the notice

---

[27] *In re Harris*, 50 B.R. 157, 161 (Bankr. E.D. Wis. 1985) (holding that hospital did not have lien where hospital did not offer proof that it filed written notice of lien with clerk of court and did not present evidence that it sent notice of lien to debtor and insured;  W.S.A. 779.80(3)(b) provided that if these conditions were not satisfied "the lien shall be void.").

[28] *Duke Univ. Med. Ctr. v. Hardy*, 89 N.C. App. 719, 720, 367 S.E.2d 6,7 (1988).

[29] *Id.*, 89 N.C. App. at 720, *quoting* G.S. 44-50.

19

provisions to the allegedly liable person and his insurance carrier are not essential to enforcement against the injured person.

### B. The Medical Center does not have an interest in the two vehicles purchased with the personal injury settlement proceeds.

The foregoing establishes that the lien attached to identifiable settlement funds when under the control of the Debtors. In this case, however, the Debtors as of the date of filing the state court action and the date of filing the bankruptcy no longer had the funds, but a large portion of the proceeds have been traced to the purchase of the two vehicles, in which the Medical Center claims a constructive trust or special equity. Of course, Debtors assert the Medical Center has no interest in the vehicles which they claim as exempt.

Although the Medical Center does not contend the lien statue created a lien in property purchased with the settlement funds, the Court pauses to consider this issue. Pursuant to K.S.A. 65-406(a), if the injured patient asserts or maintains an action for damages on account of the injuries, the hospital is granted a lien in "that part [of the damages] going to or belonging to such patient of any recovery or sum had or collected or to be collected . . . whether by judgment or by settlement or compromise." The statute does not expressly extend the lien to the proceeds of the settlement proceeds; the lien attaches only to the damages going to the patient and any sum had or collected. This definition of the scope of the hospital lien is in stark contrast to Article 9 of the UCC, which expressly provides that unless otherwise agreed "a security interest attaches to any identifiable proceeds of collateral."[30] The applicable rules of construction caution against extending a statutory lien beyond the scope the legislature established.[31] The Supreme Court of

---

[30] K.S.A. 84-9-203(f).

[31] *See Jefferson County Coop. Ass'n v. Ne. Kan. Prod. Credit Ass'n*, 73 B.R. at 5.

Iowa, when construing a statute describing the lien in terms identical to K.S.A. 65-406, states that the "lien . . . continues as long as funds obtained as recovery for bodily injury remain intact and identifiable."[32] One authority states hospital liens attach to the patient's personal injury claim or cause of action, not to property.[33] Therefore, the Court concludes that the Medical Center does not have lien in the vehicles pursuant to K.S.A. 65-506, even though the purchase of the vehicles is directly traceable to the settlement funds.

Although this result appears harsh, the Medical Center does not contend to the contrary.[34] Rather it relies upon the doctrines of constructive trust and special equity to establish an interest in the vehicles. It is frequently said that "a constructive trust arises whenever the circumstances under which property was acquired make it inequitable that it should be retained by the person who holds the legal title."[35] However, "[u]nfairness is not reason enough to impose a constructive trust."[36] The equitable remedy of a constructive trust "may not be imposed unless relief at law would be inadequate."[37] To prove a constructive trust, there must be a showing of

---

[32] *Baker v. Iowa Methodist Med. Ctr.*, 542 N.W.2d at 849.

[33] Alaina N. Stout, *Statutory Liens for Health Care Providers*, 18 Health Lawyer 10 (Aug. 2006).

[34] The Court notes that the Medical Center could have protected itself against the injured party's use of the proceeds by complying with the statutory prerequisites for imposing liability on the allegedly liable party's insurance carrier that paid the injured party without taking into account the Medical Center's lien.

[35] *Garrett v. Read*, 278 Kan. 662, 673, 102 P.3d 436, 445 (2004), *quoting Logan v. Logan*, 23 Kan. App.2d 920, Syl. ¶ 6, 937 P.2d 967, *rev. denied* 262 Kan. 962 (1977).

[36] 76 Am. Jur.2d *Trusts* § 168 (2007).

[37] *Id.*.

Case 06-05182    Doc# 58-1    Filed 07/10/07    Page 21 of 32

fraud, either actual or constructive.[38] "Actual fraud is an intentional fraud, and the intent to deceive is an essential element."[39] In contrast, constructive fraud is a "breach of a legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others or violate a confidence."[40] When reliance is placed on constructive fraud there are two additional elements required: (1) a confidential relationship; and (2) betrayal of the confidential relationship or a duty imposed by the relationship must be breached."[41]

The Court declines to find that the vehicles are subject to a constructive trust. There is no evidence of actual fraud in using the settlement proceeds to purchase the two vehicles. Debtors had been advised by their counsel that the Medical Center's lien was defective. They intended to work out a payment arrangement with the Medical Center through the Financial Assistance Program. They did not act with intent to deceive the Medical Center or take property which in their view belonged to the Medical Center. They were not acting to deceive the Medical Center.

Likewise, there is no evidence of a confidential relationship, which is an essential element of constructive fraud. A fiduciary relationship has been defined as follows:

> A fiduciary relationship imparts a position of peculiar confidence placed by one individual in another. A fiduciary is a person with a duty to act primarily for the benefit of another. A fiduciary is in a position to have and exercise, and does have and exercise

---

[38] *Logan v. Logan*, 23 Kan. App.2d 920, 926, 937 P.2d 967, 974 *rev. denied* July 11, 1997, *quoting Kampschroeder v. Kampschroeder*, 20 Kan. App.2d 361, 364, 887 P.2d 1152, *rev. denied* 257 Kan. 1092 (1995).

[39] *Moore v. State Bank of Burden*, 240 Kan. 382, 389, 729 P.2d 1205, 1212 (1986).

[40] *Id.*

[41] *Logan v. Logan*, 23 Kan. App.2d at 926, 937 P.2d at 974.

22

influence over another.  A fiduciary relationship implies a
condition of superiority of one of the parries over the other.
Generally, in a fiduciary relationship, the property, interest or
authority of the other is placed in the charge of the fiduciary.[42]

There are two types of fiduciary relationships: Those specially created by contract, such as

attorney and client; and those "implied in law due to the factual situation surrounding the

involved transactions and the relationship of the parties to each other and to the questioned

transactions."[43]  "Some of the indicia of a fiduciary relationship include the acting of one person

for another; the having and exercising of influence over one person by another; the reposing of

confidence by one person in another; the inequality of the parties; and the dependence of one

person upon another."[44]  Factors such as weakness by age, lack of business intelligence, and

knowledge of the facts often play a role.[45]  Whether a confidential relationship exists depends on

the facts of each case.[46]

Here, there are no facts suggesting an agreement giving rise to a confidential relationship

with the Debtors.  The Court rejects Medical Center's contention that the Admission Consent

Agreement is a contract creating a confidential relationship.  The admissions agreement

obligated the Debtors by contract to pay for the services rendered; it did not impart a duty on the

Debtors to act primarily for the benefit of the Medical Center or give the Debtors influence over

the Medical Center.  After Valerie Brown's discharge from the Medical Center, the relationship

---

[42] *Denison State Bank v. Madeira*, 230 Kan. 684, 692, 640 P.2d 1235, 1241 (1982).

[43] *Id.*, 230 Kan. at 691, 640 P.2d at 1241.

[44] *First Bank of Wakeeney v. Moden*, 235 Kan. 260, 262, 681 P.2d 11, 13 (1984).

[45] *Id.*

[46] *Denison State Bank v. Madeira*, 230 Kan. at 691, 640 P.2d at 1241.

23

between the Browns and the Medical Center was that of debtor-creditor. The Kansas courts have found that a creditor-borrower relationship, which is a particular type of creditor-debtor relationship, is not a confidential one.[47]

The hospital lien statute likewise cannot be a source of a contract based fiduciary relationship. It did not create a voluntary relationship between the Debtors and the Medical Center. It imposed an involuntary statutory lien on proceeds otherwise belonging to the Debtors. Debtors' breach of the statutory duty to hold the funds for the benefit of the Medical Center was the breach of a duty based upon the statute, not breach of a contract giving rise to a fiduciary duty.

Likewise, there is nothing in the facts and circumstances of this case from which a court could find a fiduciary relationship. The Debtors had no influence over the Medical Center, the Debtors did not dominate the Medical Center, and the Medical Center was not dependent upon the Debtors, since the legislature provided means for the Medical Center to assure collection of the settlement money from persons other than the injured patient. The Medical Center, rather than the Debtors, had superior business intelligence. This is a simple and common case where the Debtors had possession of property in which the Medical Center had an interest. The law does not regard this circumstance as giving rise to a fiduciary relationship. The absence of a fiduciary relationship is fatal to the constructive trust theory that is based upon implied fraud.

---

[47] *Daniels v. Army Nat. Bank*, 249 Kan. 654, 657, 822 P.2d 39, 42 (1991) (holding that lender-borrower relationship creates no special duty) .

The Court also rejects Medical Center's claim that it has a peculiar equity in the vehicles because they were purchased with funds that were subject to the Medical Center's lien. This Court thoroughly examined Kansas law on the doctrine of peculiar equity in *In re Sager*.[48] It described the doctrine as an exception to a debtor's ability to convert nonexempt assets to exempt property, which requires "a showing of fraudulent intent and the tracing of nonexempt assets in which an objecting creditor held an interest to the exempt property."[49] In this case, the Medical Center has traced funds in which it had a lien to the purchase of the exempt vehicles, but it has not established fraudulent intent. Both vehicles were purchased after the Debtors' personal injury attorney advised them that in his opinion the Medical Center's lien was not enforceable. Debtors testified that they relied upon this advice, had no intent to avoid payment to the Medical Center, and had not decided to file for bankruptcy before purchasing the vehicles. The Medical Center has not satisfied the requirements of the peculiar equity doctrine.

Both constructive trust and peculiar equity are equitable doctrines. In this case, equity would not be promoted by their application. Rather imposition of a constructive trust or the finding of peculiar equity would circumvent the balance of rights and interests established by the Bankruptcy Code. Medical Center asserted a constructive trust in the state court litigation at a time when it knew that Debtors had used the proceeds to purchase the vehicles and were likely to file for bankruptcy relief.[50] As a likely creditor in bankruptcy, the Medical Center faced at least

---

[48] *Bankwest of Kansas v. Sager (In re Sager)*, Case no. 03-13626; Adv. no. 03-5308 (Bankr. D. Kan. Feb. 25, 2005) (Somers, J.).

[49] *Id.* at 20.

[50] If the bankruptcy had not been filed, the Medical Center could enforce its state court judgment against the Debtors and assets of the Debtors through execution. Bankruptcy generally bars that recovery.

25

two problems.  First, because the hospital lien statute does not impose a lien in the identifiable proceeds of the settlement funds, the Medical Center would be an unsecured creditor.  Second, vehicles for personal use are exempt and their value not available to pay creditors, including the Medical Center.  The imposition of a constructive trust on the vehicles or a finding that the Medical Center had a special equity in the vehicles from the time of their purchase would solve these problems by removing the vehicles from the bankruptcy estate[51] and recognizing the Medical Center's asserted interest in the vehicles.  Therefore, if either of these doctrines were applicable, the Medical Center's interest in the vehicles would trump the impact of the bankruptcy filing and give the Medical Center the equity in the vehicles as if it held an unavoidable perfected repetition lien.  Medical Center could collect its claim from the property, rather than share in the assets as an unsecured creditor and have its claim discharged.

This Court finds that such a result would not be equitable; rather it would result in the Medical Center receiving special privileges outside the Code and Kansas creditor law.  The circumstances of this case do not warrant such exceptional treatment.  Like many other bankruptcy creditors, the Medical Center had pre-petition rights which were not honored by the Debtors.  Medical Center did not exercise all available remedies to protect itself.  By giving notice of its lien to the liability insurance carrier, the Medical Center could have protected the enforcement of its lien, but it failed to do so.  Also, subsequent to the filing of the state court litigation and the Debtors' bankruptcy, the Medical Center received almost $25,000 from Debtors' personal injury law firm for application to the claim against Debtors.  K.S.A. 65-406

---

[51] Pursuant to 11 U.S.C. § 541, the estate is composed of all legal and equitable interests of the debtors in property on the date of filing.  Property which the debtors hold only bare legal title avoid and are acting as trustee is not included in the estate but is deemed to be property of the beneficiary of the trust.

provides for a lien of $5,000 and such amount above $5,000 as is an "equitable distribution of any settlement under the circumstance." Valerie Brown was very severely injured. A court determining an equitable distribution most likely would not have found that the Medical Center was entitled to all of the settlement and the Debtors nothing.

.    **C. Medical Center's complaint for denial of dischargeabilty pursuant to § 523(a)(6) is denied.**

Medical Center seeks an order that its claim is nondischargeable pursuant to § 523(a)(6).[52] That subsection provides that a discharge under section 727 does not discharge an individual debtor from any debt for "willful and malicious injury by the debtor to another entity or to the property of another entity." The objecting creditor has the burden to establish the elements of the exception by a preponderance of the evidence.[53] "Section 523(a)(6) generally relates to torts and not to contracts."[54] An objection to discharge under this section can be sustained only where there is proof of both a willful act and a malicious injury.[55] "[N]ondischargeablility takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury."[56] "[D]ebts arising from recklessly or negligently inflicted

---

[52] Since the Court finds the claim is dischargeable, it does not address any distinction for purposes of § 523(a)(6) between Valerie Brown, the injured person to whom most if not all of the personal injury settlement funds were owed, and co-debtor, Barry Brown, her husband, whose conduct is central to the Medical Center's contention of nondischargeability.

[53] *First Nat'l Bank of Gordon v. Serafini (In re Serafini)*, 938 F.2d 1156, 1157 (10th Cir. 1991).

[54]  4 *Collier on Bankruptcy* ¶ 523.12[1](Alan N. Resnick & Henry J. Sommer eds.-in-chief, 15th ed. rev. 2006).

[55] *Panalis v. Moore (In re Moore)*, 357 F.3d 1125, 1129 (10th Cir. 2004).

[56] Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998).

27

injuries do no fall within the compass of § 523(a)(6)."[57]  In the analogous situation of pre-petition conversion of collateral, a commentator relying upon a tenth circuit opinion[58] states the following regarding application of § 523(a)(6):

> Secured creditors whose collateral was disposed of by the debtor often assert nondischargeability claims under section 523(a)(6) on the theory that the security interest was willfully and maliciously converted.  Transfers in breach of a security agreement may give rise to nondischargeable liability when the debtor's conduct is knowing and certain to cause financial harm.  Unless the creditor can prove not only that the debtor knew of the security interest, but also that the debtor knew that a transfer of the property was wrongful and certain to cause financial harm to the creditor, the debt should not be found nondischargeable.  Courts must be careful not to equate a breach of a contract, which happens to be a security agreement, with conduct causing willful and malicious injury.[59]

The Court finds that the evidence in this case does not establish a willful and malicious injury to Medical Center's property interest, comprised of its statutory lien in personal injury settlement proceeds.[60]  "[T]o constitute a willful act under § 523(a)(6), the debtor must 'desire . . . [to cause] the consequences of his act or . . . believe [that] the consequences are substantially certain to result from it.'"[61]  "[T]he term 'malicious' requires proof 'that the debtor [sic] either intend the resulting injury or intentionally take action that is substantially certain to cause the

---

[57] *Id.*, 523 U.S. at 64.

[58] *C.I.T. Fin. Servs., Inc. v. Posta (In re Posta)*, 866 F.2d 364 (10th Cir. 1989).

[59] 4 *Collier on Bankruptcy* ¶ 523.12[3].

[60] At oral argument following trial, counsel for the Medical Center agreed that the claim of exception to discharge is based upon the finding of a lien in the personal injury settlement funds.

[61] *Panalis v. Moore (In re Moore)*, 357 F.3d 1125, 1129 (10th Cir. 2004), *quoting Mitsubishi Motors Credit of America, Inc. v. Longley (In re Longley)*, 235 B.R. 651, 657 (10th Cir. BAP 1999).

injury.'"[62] "[T]he focus of the 'malicious' inquiry is the debtor's actual knowledge or reasonable foreseeability that his conduct will result in injury to the creditor," not on an abstract or moral notion that the conduct was wrongful.[63]  As to proof of malicious intent, the Tenth Circuit has stated:

> Under § 523(a)(6), the debtor's malicious intent can be shown in two ways.  In the rare instances in which there is direct evidence that the debtor's conduct was taken with the specific intent to harm the creditor, the malice requirement is easily established . . ..  More commonly, however, malicious intent must be demonstrated by evidence that the debtor had knowledge of the creditor's rights and that, with that knowledge, proceeded to take action in violation of those rights.[64]

In *In re Tucker*,[65]  the foregoing standards for nondischargeability under § 523(a)(6) were found not to be satisfied under circumstances similar to this case.  At the pre-admission conference prior to debtor's scheduled back surgery, debtor was informed that her health coverage was such that the benefits would be paid directly to her, rather than the hospital.  At the hospital's request, debtor signed an "acknowledgment" that recited information regarding her insurance coverage, and included a promise by debtor that she would forward to the hospital any payments made directly to her.  It stated, "this is a direct assignment of my rights and benefits under this policy."  Nevertheless, when the insurance moneys were received, debtor endorsed the checks and deposited them into a joint account.  Debtor spent the money to pay bills because of financial difficulty.  At trial debtor testified she thought the checks were hers to keep, that she

---

[62] *Id., quoting Hope v. Walker (In re Walker)*, 48 F.3d 1161, 1164 (11th Cir. 1995).

[63] *In re Posta*, 866 F.2d at 367.

[64] *Id.*

[65] *Tulsa Spine Hosp. v. Tucker (In re Tucker)*, 346 B.R. 844 (Bankr. E.D. Okla. 2006).

called the hospital to make arrangements for payment, and made some payments pre-petition. The court denied the hospital's complaint to except its debt from discharge under § 523 (a)(6). The court relied upon debtor's testimony, which it believed, that she intended to pay off the debt in installments and she did not intend to defraud or intentionally injure the Plaintiff by deliberately failing to pay her bills. As to circumstances supporting this testimony, the court noted that there was a delay of about eight months from the time she received the payments to the date of filing, that she made some payments to the hospital, and that she disposed of the proceeds with some justification since she was not entirely certain of the legal effect of the assignment. "The facts fit within the realm of a deliberate or intentional act that leads to injury, rather than a deliberate and intentional injury . . .. This debt is in the nature of a breach of contract rather than an intentional tort."[66]

In this case, likewise, the Medical Center has not met its burden of proof. Like the debtor in *Tucker*, Debtors engaged in intentional acts that lead to injury, but there is no evidence of malicious injury. The Debtors knew that the Medical Center asserted an interest in the settlement proceeds; however, they did not know that the Medical Center had an interest. Rather, they relied upon the advice of their counsel that the lien was not effective. Believing that the lien was not effective, the Debtors could not have known that their use of the proceeds was wrongful and certain to cause financial harm to the Medical Center. The Court finds credible the Debtors' testimony that they did not intend to harm the Medical Center and intended to make payment arrangements. Submitting the application for financial assistance and contacting the Medical Center after the state court suit was filed support this intent. As in *Tucker*, when the

---

[66] *Id.*, 346 B.R. at 853-854.

30

proceeds were received, the Debtors were in financial difficulty, since both were unemployed. Only one of the two vehicles was purchased shortly after receipt of the check. Although the proceeds were received in June, the bankruptcy filing was delayed until January, after the Medical Center had filed suit and taken judgment against the Debtors. The Debtors acted with just cause. Without a definitive ruling that the lien was not in place, the Debtors' use of the proceeds was at most negligent conduct taken in disregard of the Medical Center's allegations of a lien.

The Court rejects the Medical Center's arguments that the surrounding events evidence wrongful conduct sufficient to find both willful and malicious injury. The circumstances the Medical Center relies upon such as failure to provide complete information to Midland, failure to report the personal injury settlement to the Medical Center, and failure to respond to the Medical Center's settlement offer, evidence lack of urgency in reaching agreement regarding payment. No inferences of malicious injury can be drawn from Debtors' failure to inform the Medical Center of the settlement with Mr. Salinas. Naturally, because the Debtors were advised that the lien was not valid, they would not believe they were under a duty to inform the Medical Center of receipt of the settlement proceeds. Failure to complete a negotiated settlement does not evidence absence of intent to pay. Before the state court suit was filed, Debtors were providing information to Midland, although not to Midland's full satisfaction. Based upon the Debtors' credible testimony, Debtors regarded the proposal for a reduced lump sum payment as not fair. They desired to make periodic payments. The Court strongly disagrees with the Medical Center's assertion that Debtors conduct "evidences that debtors never intended to pay plaintiff anything at all." The Court finds Debtors' testimony to the contrary credible. The Court also

31

rejects as irrelevant to the question of dischargeability under § 523(a)(6) the evidence adduced by the Medical Center as to omissions from the Debtors' bankruptcy schedules. They shed no light upon Debtors' intent toward the Medical Center several months prior to the bankruptcy filing.

For the foregoing reasons, the Court denies the Medical Center's dischargeability complaint. The Debtors did not act willfully and maliciously when they used the settlement proceeds for their living expenses and vehicle purchases rather than satisfaction of the Medical Center's claim. There is no direct evidence that Debtors acted with specific intent to harm the Medical Center's interest in the settlement proceeds and no basis to infer malicious intent based upon actions taken. Rather, the evidence establishes that Debtors believed the proceeds did not belong to the Medical Center because they were advised that the lien was not effective. As in *Tucker*, this debt is a breach of contract, rather than an intentional tort.

**CONCLUSION.**

For the foregoing reasons, the Court finds the Medical Center does not have an interest in Debtors' two vehicles and denies the motion for relief from stay. The Court also finds the Medical Center has not sustained its burden of proof on its complaint of nondischargeability pursuant to § 523(a)(6) and denies the same.

The foregoing constitute Findings of Fact and Conclusions of Law under Rule 7052 of the Federal Rules of Bankruptcy Procedure and Rule 52(a) of the Federal Rules of Civil Procedure. A judgment based upon this ruling will be entered on a separate documents as required by Federal Rule of Bankruptcy Procedure 9021 and Federal Rule of Civil Procedure 58.

**IT IS SO ORDERED.**

###

32